UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
CHARLES BRADY,

               Plaintiff,

              v.

CALYON SECURITIES (USA) F/K/A CREDIT
LYONNAIS SECURITIES (USA) INC., CALYON,
CREDIT AGRICOLE S.A., ERIC SCHINDLER and
FRANCOIS PAGES,

               Defendants.

------------------------------------------------------------------ x

05 Civ. 3470 (GEL)

## DEFENDANTS' STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

1. At all relevant times, Credit Lyonnais Securities (USA), Inc. ("CLS") was a broker-dealer incorporated in New York. (Affidavit of Francois Pages, ¶ 2)

2. In May 2004, the name of CLS was changed to Calyon Securities (USA) Inc. (together referred to as "CLS") in connection with the acquisition of its indirect parent by Credit Agricole, S.A. in Paris. (Pages Aff., ¶ 2).

3. CLS hired plaintiff Charles Brady in February 1999 as an equity research analyst covering the automotive and related industries. (Deposition of Charles Brady at 74; Ex. F)

4. Francois Pages, the Chief Executive Officer of CLS, approved the hiring of plaintiff. (Pages Aff., ¶ 3; Deposition of Francois Pages at 59-60)

5. When he was hired, plaintiff was a 45-year-old, American, West Point graduate who had served in the U.S. military – stationed in Colorado and Georgia (Brady dep. at 47-48) – from June 1975 to September 1980. (Brady dep., Ex. B at ¶¶ 15, 16 & 61; Brady dep., Ex. A;

Hayes Aff., ¶ 15.) Plaintiff never served in Vietnam. (Brady dep. at 47-48)

6.Plaintiff signed an offer letter that set his compensation and certain revenue-based additional compensation for 1999 only and also provided that he would be "eligible for a discretionary bonus in 1999." (Brady dep., Ex. F) CLS did not give employment contracts. (Deposition of Donna Hayes at 83)

**The Employee Handbook**

7.When he was hired, plaintiff received and read the Employee Handbook and signed an acknowledgement agreeing to be bound by its policies, which were subject to change without notice. (Brady dep. at 277, Ex. EEE; Ex. FFF at CLS/Brady 0006)

8.The very first page of the Employee Handbook – then and now – contained an explicit employment-at-will policy, which states:

> "This handbook is not, and nothing in it is meant to create, a contract or promise of employment or any particular terms and conditions of employment or to alter the at-will relationship between [CLS] and you. [CLS] does not guarantee your employment for any period of time, and either you or [CLS] may terminate your employment at any time and for any reason. Furthermore, no one at [the employer] is authorized to make you any oral or written promises which would alter your status as an employee-at-will."

(Ex. FFF at CLS/Brady 0007; Hayes dep. at 79-81)

9.The Employee Handbook also contained – then and now – a policy entitled "Bonus,": which states:

> "Management of [CLS] may, in its discretion, grant a bonus to any or all of its employees.... Payment of a bonus is not guaranteed; management may choose to grant or not grant a bonus at year-end to any or all of its employees."

(Ex. FFF at CLS/Brady 0009; Hayes dep. at 79-81)

10.The Employee Handbook contains a strong anti-discrimination policy and instructs employees who believe they are the victims of unlawful discrimination to "bring those

2

issues to the attention of his or her supervisor, to the Human Resources Department or to any member of management with whom the employee feels comfortable. Employees may make reports or raise concerns regarding discrimination without fear of reprisal. All reports will be treated discreetly and will be promptly and thoroughly investigated." (Ex. FFF at CLS/Brady 0007)

11.  Except for benefits updates, the Employee Handbook is the same today as it was when plaintiff was hired. (Hayes Aff., ¶ 5; Hayes dep. at 81)

**The Compliance Manual**

12.  When he was hired, plaintiff also received a Compliance Manual. (Brady dep. at 278 & Ex. GGG.) The Compliance Manual has been amended a number of times. (Deposition of Christian Billet at 32)

13.  The Compliance Manual plaintiff received when he was hired by CLS states:

> It must be emphasized that this compliance manual cannot provide a complete description of the legal and ethical obligations of our employees and cannot be relied upon as such. Situations may arise in which the proper course of conduct is not clear. In those situations and in those circumstances where there is a question as to the propriety of a particular course of conduct or interpretation of the compliance manual, you should contact the compliance director immediately.

(Brady dep., Ex. GGG; Brady dep. at 279-81) Such a provision was included in all Compliance Manuals during plaintiff's employment. (Billet Aff., ¶ 4) Like all CLS policies, Compliance Manuals are subject to change without notice. (Brady dep., Ex. FFF at CLS/Brady 0006; Billet Aff., ¶ 5)

14.  The Director of Compliance, George Howard, regularly communicated with CLS's regulators at the New York Stock Exchange to determine appropriate application of rules and regulations to CLS, a relatively small broker-dealer that had fewer employees and layers of management than the large Wall Street institutions. (Howard Aff., ¶ 3; Howard dep. at 78, 149

3

("we have audits and we talk them about it and they help us interpret it"; *see also* Howard dep. at 167, 209, 213, 215; Howard Aff. ¶ 5) Counsel was also involved in helping CLS to implement the rules. (Billet dep. at 58; Billet Aff., ¶ 6; Howard Aff.. ¶ 3) The Compliance Manual instructed employees to speak with Mr. Howard if they had questions or needed help in understanding or applying the rules applicable to CLS. (Brady dep. at 279-81; Ex. GGG at CLS/Brady 0159; Howard Aff., ¶ 4)

15.    CLS had no whistleblower policy at any time during plaintiff's employment. (Billet Aff., ¶ 3). Such a policy was put in place for the first time in November 2004, as part of a policy directive from Credit Agricole in Paris some six months after it acquired CLS and more than four months after plaintiff was terminated. (*Id.*) Some of the policies put into effect in and after November 2004 were added as appendices to manuals that had originally been created much earlier; for example, Ex. 5 was added in November 2004 to a handbook that had first been put into effect in May 1998 – and the notation "Effective: 5/98" appears on Ex. 5 for that reason, though Ex. 5 was not in effect at CLS until at least November 2004. (*Id.*)

**Plaintiff's Prior Employment**

16.    Before being hired by CLS, plaintiff had been employed by a company called C.L. King, which terminated him after only six months of employment. (Brady dep. at 338, Exs. III, A) The Form U-5 that C.L. King filed with the National Association of Securities Dealers ("NASD") to report the reason for plaintiff's termination – as required by the NASD for all registered employees in the securities industry (Billet Aff. ¶ 11) -- stated that plaintiff was terminated for "failure to meet productivity goals." (Ex. I)

17.    After his termination plaintiff sued C.L. King, alleging breach of contract and age discrimination. (Brady dep., Ex. III) Plaintiff alleged in that case that C.L. King had referred to

4

him as "a tired old man" and wondered "who knows what an old guy like you knows." Brady Dep., Ex. KKK, at CLS/Brady 1851-52)

19. 18.    After he had been employed for more than a year at CLS, on April 7, 2000 plaintiff gave a deposition in his lawsuit against C.L King. (Brady dep. at 338, Ex. KKK at CLS/Brady 1883) Plaintiff stated under oath that he had no employment contract with CLS. (*Id.* at CLS/Brady 1892 (Q. Do you have an employment agreement with Credit Lyonnais? Mr. Hubell: "You mean a written document?" Q. "Any sort of agreement, then I'll get to whether or not it's in writing or verbal." A. "At present I do not." Q. "When you first became employed there, did you have a written employment contract?" A. "Yes, I did." Q. "And that contract expired?" A. "Yes.")

19.    Richard Hubell, plaintiff's lawyer here, also represented plaintiff in his case against C.L. King. (Brady dep., Ex. KKK)

**Plaintiff is Promoted to Director of Research**

20.    Plaintiff was a capable research analyst at CLS (Pages dep. at 64, Pages Aff., ¶ 4); he received good performance evaluations in that role. (Hayes Aff., ¶ 7; Brady dep., Exs. M, P, Q.) Around the end of 2001, Mr. Pages offered plaintiff the opportunity to become Director of Research, effective in early 2002. (Pages Aff., ¶ 4) Plaintiff had never before been a Director of Research. (Brady dep. at 357-58) Mr. Pages made this offer to plaintiff in an effort to inspire the Research team by promoting one of its members. (Pages Aff., ¶ 4)

21.    Plaintiff was 48 years old, an American and a graduate of West Point who had served in the U.S. military when Mr. Pages promoted him to be Director of Research. (Hayes Aff., ¶ 8; Brady dep., Ex. A)

**The Discussion of the Iraq War**

5

22.     When France announced in or about early 2003 that it would not support a U.S. invasion of Iraq, Human Resources received a report of inappropriate jokes by employees relating to this controversy, which was under debate at the United Nations. (Hayes dep. at 56; Hayes Afft., ¶ 9) John Quinn, the head of Human Resources, issued a memo to all employees on March 12, 2003 reminding them that "inappropriate and unlawful behavior," including anti-American, anti-French and anti-Semitic remarks," would not be tolerated. (Brady dep., Ex. JJ) There were no reports thereafter of such "inappropriate and unlawful behavior." (Hayes Aff., ¶ 9)

23.     Around the same time, plaintiff told Mr. Pages that as a West Point graduate he received emails from his former classmates discussing the Iraq situation, and he forwarded one of these emails on April 9, 2003 to Mr. Pages with the note: "Thought you might be interested in # 3." (Howard dep., Ex. 9; Pages Aff., ¶5) Plaintiff said Mr. Pages told him that while "his impression was that [the invasion] was a mistake...he was looking forward to seeing what my side had to say about it. I said, 'I'll send you some stuff.'" (Brady dep. at 292-94)

**CLS Cuts Staff to Prepare for a Corporate Acquisition**

24.     In or about early 2003, it became clear that CLS and its indirect parent, Credit Lyonnais, S.A., a French banking institution headquartered in Paris, were likely to be acquired by another institution, and CLS began cutting staff in anticipation of that event. (Pages Aff., ¶ 6) The "mandate" that "a certain number of people were to be terminated" came "from above" the level of defendant Eric Schindler, Head of U.S. Efforts, who oversaw Research. (Brady dep. at 81.) Nearly 100 employees were terminated in early 2003, including a number of Research analysts, and thereafter a hiring freeze was imposed. (Hayes Aff., ¶ 10; Pages Aff., ¶ 6)

**Plaintiff Threatens to Resign Unless His Demands Are Met**

25. In early June 2003, plaintiff began to discuss potential employment with another company. (Brady dep. at 133) On June 22, 2003, plaintiff told Mr. Pages that he weas planning to resign, and a lunch was scheduled for the next day. (Pages Aff., ¶ 7; Howard dep., Ex. 9 at CLS/Brady 1453) At that lunch, plaintiff told Mr. Pages that he was going to join another employer unless Mr. Pages gave him an immediate promotion in rank to Managing Director, a salary increase to $200,000 and a guaranteed bonus of $300,000 for 2003, for total compensation of $500,000. (Pages dep. at. 93-95; Pages Aff., ¶ 7)

26. Mr. Pages believed he would experience great difficulty in hiring someone to replace plaintiff as Director of Research at that time – both because of the hiring freeze and because it was well-known that CLS was likely to be acquired – and therefore Mr. Pages agreed to promote plaintiff to Managing Director effective July 1, 2003 and increase his annual salary to $200,000. (Pages Aff., ¶ 7; Brady dep., Ex. NN)

27. Plaintiff also asked Mr. Pages to guarantee him a $300,000 bonus for 2003; while Mr. Pages could not make such a promise without concurrence of the Compensation Committee, Mr. Pages gave plaintiff his word that he would use his best efforts to obtain approval for a $300,000 bonus when the Compensation Committee met in early 2004 to decide bonuses for 2003. (Pages Aff., ¶ 7) Mr. Pages believed that plaintiff's demands – in the midst of a hiring freeze and institutional uncertainty – constituted "blackmail." (Pages dep. at 98.)

28. Mr. Schindler agreed with Mr. Pages' decision to promote plaintiff and increase his compensation. (Pages Aff., ¶ 8; Schindler dep. at 100)

29. In early 2004, Mr. Pages kept his commitment to plaintiff, and the Compensation Committee awarded plaintiff the $300,000 bonus he had requested for 2003. (Pages Aff., ¶ 9; Brady dep., Ex. QQ)

30.     The Compensation Committee consisted of Jean-Marc Moriani, Mr. Pages and Head of Human Resources John Quinn. (Pages Aff., ¶ 9; Pages dep. at 126) Plaintiff was never a member of that committee and therefore had no firsthand knowledge of its activities. (Brady dep. at 340)

**Plaintiff's 2003 Performance Appraisal**

31.     In or about late 2003 or early 2004, Mr. Schindler, the head of U.S. Efforts – who oversaw Research as well as a substantial number of other functions within CLS (Howard dep. at 164) – prepared the first draft of the appraisal form to evaluate plaintiff's work for 2003. (Schindler dep. at 130)

32.     Plaintiff received written performance evaluations every year except 2002. It was not unusual for high-level employees like plaintiff to receive written evaluations on an irregular basis. (Pages dep. at 10; Howard dep. at 234-35; Howard Aff., ¶ 7; Schindler dep. at 87)

33.     As the "First Assessor," Mr. Schindler filled out most of the appraisal form and gave plaintiff a rating of "3," described by the words "Meets Requirements." Mr. Schindler wrote, among other things, that plaintiff "has maintained the quality of the research" and "has strengthen [sic] the coordination with the U.S. Secondary Research." (Brady dep., Ex. Z.) He gave plaintiff largely ratings of "3," though rating him higher ("4") in the categories of technical and product knowledge and market and product knowledge and lower ("2" – "marginal") in problem solving, planning skills meeting organizational objectives, business strategy, initiative and motivation, creativity, attitude and decision-making skills. (*Id.*) Mr. Schindler wrote that plaintiff "has not emerged as a decisive leader of his team and sometimes gets confused in his role as a leader and fails to set boundaries with his staff. Charles has poorly managed the moral[e] crisis of his team at the beginning of the year." (*Id.*)

8

34. The criticism about "the moral[e] crisis of his team" refers to plaintiff's "very poor[]" handling of disgruntlement among his team after CLS awarded "very small bonus payments" because of a "bad year" financially. (Schindler dep. at 180-81)

35. Mr. Schindler also wrote on plaintiff's appraisal that "Communication with his team is weak....Charles has not succeeded in positioning internally the research team as a valuable asset, more specifically in the Fixed Income world." (Brady dep., Ex. Z; *see also* Schindler dep. at 144: "he was only doing equity research, and we wanted to develop the fixed income side of research....that was very important to us.")

36. After setting future goals for plaintiff, Mr. Schindler wrote, in the overall evaluation section, that "we are disappointed with the way Charles has been managing and guiding his team. His style of management is too passive. He is expected to be a driving force and to play a more active role in developing ideas or strategic moves. Charles is expected to show clear improvement in these areas." (Brady dep., Ex. Z)

37. After completing most of the form, Mr. Schindler sent the appraisal to Mr. Pages for his contributions as the "Second Assessor." Though Mr. Pages generally thought that Mr. Schindler had given plaintiff somewhat higher ratings than Mr. Pages would have given, on many of the specific items he deferred to the more favorable views of Mr. Schindler (Pages Aff., ¶ 10) Mr. Pages added his written comments in the "Second Assessor" box – stating that "I am expecting much more from Charles as a leader of the Research department: more visibility, more aggresivity to promote internally his department, more interaction with the other group leaders." (Brady dep., Ex. Z)

**Pages Lowers the Rating Schindler Gave Plaintiff**

38. Disagreeing with the "3" rating given to plaintiff by Mr. Schindler, Mr. Pages lowered the overall rating Mr. Schindler had assigned to plaintiff, adding a "minus" sign before

9

the "3" rating to signify that he rated plaintiff as less than satisfactory. (Pages Aff., ¶ 11; Pages dep. at 149) A rating of "3" or less was not a good rating for the manager of a team. (Pages Aff., ¶ 11; Pages dep. at 146)

39.   In lowering plaintiff's overall rating, Mr. Pages was mindful that in June 2003 plaintiff had made demands for promotion and additional compensation, and Mr. Pages was expecting a significantly higher level of performance from plaintiff to correspond to his higher title and compensation level. (Pages Aff., ¶ 12) Mr. Pages was also mindful of complaints he had heard from the sales staff about Research failing to provide sufficient product to enable the sales force to do its job. (Pages Aff., ¶ 12, Schindler dep. at 154-55, 157-60; *see also* Affidavit of Peter Ruel, ¶¶ 2-4)

40.   Mr. Pages was also mindful that when a mandate from top management required extensive staff cuts, plaintiff vigorously fought any reduction of his staff: "I didn't think any of the positions in research should be eliminated." (Pages Aff., ¶ 12; Brady dep. at 193) "Eric had an empire of investment bankers sitting outside his door 50 percent or more of the time unemployed, and he was looking to stick his nose into the researcher's business, where he shouldn't be, and recommending that people in my department get terminated, when I thought the right course of action was to capitalize on the strength we had demonstrated and drive our rating up and become even more profitable, so, I mean, my input was what are you thinking about, why are you motivated to do this, what do you hope is the expected outcome, why don't you cut some investment bankers who aren't doing anything." He expressed the strong view to his superiors that their staff cuts were wrong and "that nobody should be eliminated." (*Id.* at 201, 203)

**Alleged Age Comments by Schindler**

10

41.     Plaintiff alleges that when he met with Mr. Schindler in early February 2004 to discuss his evaluation, Mr. Schindler referred to him as "the old man with all the wisdom" and "the old man that is so knowledgeable in research" and told plaintiff that he had given plaintiff a less-than-glowing performance evaluation because plaintiff had gone over Mr. Schindler's head to Mr. Pages – not because of plaintiff's performance. (Brady dep. at 297-99) Plaintiff does not claim Mr. Pages made or heard any age-related remarks, and Mr. Pages never uttered or heard anyone else utter any such remarks about plaintiff. (Pages Aff., ¶13)

42.     Plaintiff did not complain to Human Resources or to any member of senior management about the alleged age-related comments of Mr. Schindler, as the Employee Handbook instructs employees to do. (Brady dep. at 76-80, 118-22, 169-70, 176-81 & Ex. FFF at CLS/Brady 0007; Hayes dep. at 76; Hayes Aff., ¶¶ 11, 12)

43.     Nor did plaintiff complain to Human Resources about discrimination against him, though he had frequent contact with Donna Hayes, the Human Resources representative for his group, about personnel matters relating to his subordinates, as well as Head of Human Resources John Quinn and others in the Human Resources department. (Brady dep. at 76-79, 120-21)

**Credit Agricole Acquires CLS and Pages Terminates Plaintiff**

44.     In or about May 2004, an acquisition occurred that made CLS part of the Credit Agricole Group, and its name was changed to Calyon Securities (USA), Inc. (Pages Aff., ¶ 14) As a result of the acquisition, CLS became part of a larger, better-known institution, the hiring freeze was lifted and Mr. Pages decided to replace plaintiff with an experienced Director of Research whom he expected to be a stronger leader of the Research team. (Pages Aff. ¶ 14)

45.     Mr. Pages began a search for such an experienced Director in or about late May or early June 2004. (*Id.* at ¶ 15) In or about mid-June 2004, Mr. Pages made the decision to terminate plaintiff. (Pages Aff., ¶ 15; Pages dep. at 136) Mr. Pages instructed Mr. Schindler –

11

who had no input into the termination decision (Pages Aff., ¶15; Pages dep. at 136) – to inform plaintiff that his employment was terminated on July 1, 2004 and to take care of the details of his departure. (Pages Aff., ¶ 15)

46. The Form U-5 that CLS was required to file with the NASD stating the reason for plaintiff's termination listed the single word "performance" as the reason. (Brady dep., Ex. UU)

47. Mr. Schindler told Ms. Hayes of Human Resources that Mr. Pages had decided to terminate plaintiff "because of his leadership skills." (Hayes dep. at 146) Mr. Pages had previously told Ms. Hayes "the same thing" and had characterized plaintiff as unacceptably "passive" in managing his subordinates. (*Id.* at 147, 151)

**No Record of Complaints During Plaintiff's Employment**

48. On July 1, 2004, plaintiff went to the office of George Howard, CLS's Director of Compliance, and gave him an undated, unsigned handwritten note that appears to have been scribbled in haste. (Brady dep., Ex. G) The note purports to refer to past complaints about violations of regulatory rules. (*Id.*) At the time plaintiff handed the note to Mr. Howard, Mr. Howard knew that plaintiff had already been terminated. (Howard dep. at 145; Howard Aff., ¶ 8) In fact, Mr. Pages had informed Human Resources of his decision to terminate plaintiff a week earlier. (Pages Aff., ¶ 15; Hayes dep. at 119)

49. Though it was plaintiff's practice to retain copies of written communications that he thought were "truly significant" (Brady dep. at 58), the record contains no written complaint by plaintiff to management or Human Resources about any policy, practice or rule during his employment. In fact, the opposite is true: The evidence shows that when Mr. Pages asked plaintiff what the "practical impact for us" was of the proposed new rules for Research about which plaintiff now complains, plaintiff wrote back that there were "[a] few areas where written

12

rules will need tightening. Fortunately, we already function within the spirit of all changes mandated." (Pages Aff., ¶ 16; Pages dep., Ex.19)

50.     In addition, though plaintiff participated in CLS's internal policy audit as well as a meeting on July 25, 2003 to discuss the new rules concerning the relationship and interactions of Research and Investment Banking, nothing written by plaintiff or anyone else during plaintiff's employment mentions a violation of any such rule or policy. (Brady dep., Exs. V, W, & PP; Pages dep., Ex. 23; Howard dep., Ex. 7; Howard Aff., ¶ 5)

51.     Mr. Howard – with whom plaintiff had a good relationship (Brady dep. at 98) – included plaintiff on communications about issues of concern to Research, and plaintiff participated in a meeting with the New York Stock Exchange on July 25, 2003 specifically to answer the NYSE's questions about how the new rules relating to the relationship and interaction of Research and Investment Banking were applied at CLS. (Howard dep. at 75, 229-232; Howard Aff., ¶ 5; Brady dep. at 181-82) Plaintiff was not instructed or limited with respect to the subjects to be discussed with the NYSE. (Brady dep. at 184; Howard dep. at 229-32)

52.     Plaintiff never raised any complaints about rules violations with the NYSE. (Howard Aff., ¶ 5; Exs. HH, II; *See also* Exhs.. PP, SS, TT (reflecting plaintiff's participation in discussions involving the NYSE and/or Director of Compliance about various rules but mentioning no potential violations of the rules relating to Research and Investment Banking).

53.     Plaintiff told Mr. Howard on multiple occasions that he disliked Mr. Schindler. (Howard dep. at 83-86, Howard Aff., ¶ 6; Billet dep. at 22-23) Plaintiff told Ms. Billet that "he didn't trust Eric Schindler and that he didn't like Eric and didn't think Eric liked him." (*Id.*)

**Plaintiff's Belief Why He Was Fired**

54.     Plaintiff testified that believes he was fired for "trying to get investment banking out of research's business" and because "they wanted somebody who was a little more opento looking the other way regarding the investment banking research deals." (Brady dep. at 297-300)

### An Experienced Research Director of Similar Age Replaces Plaintiff

55.     In summer 2004, Michael Weinstein became the Director of Research. (Pages Aff., ¶17) Mr. Weinstein, a 45-year-old American (Hayes Aff., ¶ 14), previously had been a Director of Research at another firm. (Pages Aff., ¶ 17)

56.     Plaintiff was 45 years old when hired by CLS in 1999 and 50 years old when terminated in 2004. (Hayes Aff., ¶ 15) Mr. Pages, who made the decisions to hire, promote and then terminate plaintiff, as well as the decision to hire Mr. Weinstein, did not know the actual or relative ages of these two men. (Pages Aff., ¶ 18; Pages dep. at 65, 152) Nor did Mr. Schindler. (Schindler dep. at 183, 187)

### CLS Pays Plaintiff for Unused Vacation in July 2004

57.     On July 14, 2004, plaintiff was paid for a unused accrued vacation days. (Hayes dep. at 96-97, 161 & Ex. 14: "This is the payroll register, this is the money that would have been wired, directly deposited into his account. This is the register that shows that, and the pay date was July 14, 2004".) After plaintiff's termination, Human Resources, in the ordinary course of business, processed payment of unused vacation days for direct deposit into plaintiff's designated account. CLS was not notified that plaintiff's bank rejected the payment; nor was the payment returned to CLS. (Hayes Aff., ¶ 16)

### Calyon and Credit Agricole Played No Role

58.     Neither Calyon nor Credit Agricole, S.A. had any role in any decision concerning plaintiff's employment. (Pages Aff., ¶19; Howard dep. at 156-57) Neither Calyon nor Credit Agricole was the direct parent of CLS or Calyon Securities (USA), Inc. (Pages Aff., ¶ 19; Pages

14

dep. at 35: "direct parent of Calyon Securities (USA) is CL Global Partners, and CL Global Partners is owned by Calyon S.A."). Before May 2004, CLS was owned by CL Global Partners, which was owned by Credit Lyonnais Capital Markets, which was owned by Credit Lyonnais S.A. (Pages Aff., ¶ 19)

**Plaintiff Gets a New Job and Quits After Four Months**

59.  In December 2004, plaintiff began work at Institutional Investor as Director of Sales and Trading Services. (Brady dep. at 33) His compensation consisted of an annual salary of $110,000 plus a performance-based bonus. (*Id.* at 34-35) Plaintiff resigned from Institutional Investor in March 2005, after only four months, because he felt he did not have adequate staff to do his job. (*Id.*) Plaintiff did not have another job when he resigned. (*Id.*)

**CLS Received No Request for a Reference on Plaintiff**

60.  At all relevant times, it was and is CLS's policy that persons requesting references on current or former employees are told nothing more than dates of employment and titles held. Donna Hayes, the Human Resources generalist responsible for plaintiff and the Research group, never received a request for a reference concerning plaintiff. (Hayes Aff., ¶ 17)

Respectfully submitted,

HOGAN & HARTSON L.L.P.

By:  /s/ Barbara M. Roth
Barbara M. Roth (BR 1982)
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Attorneys for Defendants*