UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                   :
CHARLES J. BRADY,                                  :
                                                   :
                 Plaintiff,                        :
                                                   :          05 Civ. 3470 (GEL)
        -v-                                        :
                                                   :      **OPINION AND ORDER**
CALYON SECURITIES (USA), f/k/a                     :
CREDIT LYONNAIS SECURITIES (USA) INC.,             :
CALYON, CREDIT AGRICOLE S.A., ERIC                 :
SCHINDLER and FRANCOIS PAGES,                      :
                                                   :
                 Defendants.                       :
                                                   :
------------------------------------------------------------x

Richard A. Hubell, Hubell & Associates LLC,
New York, New York, for plaintiff.

Barbara M. Roth, Hogan & Hartson LLP,
New York, New York, for defendants.


GERARD E. LYNCH, District Judge:

        Plaintiff Charles J. Brady brings this action against his former employer, Calyon

Securities (USA) (formerly known as Credit Lyonnais Securities (USA)), its French parent

company, Calyon, previously Credit Agricole, S.A. ("Credit Agricole"), and two individual

officers and managers.  Plaintiff alleges, inter alia, that his discharge constituted a breach of

contract, and that defendants discriminated against him based on his national origin, age, and

prior military service.  Defendants move for summary judgment, arguing, inter alia, that they did

not breach any implied contract with plaintiff, and that plaintiff was discharged for legitimate,

non-discriminatory, and non-retaliatory reasons.  Defendants' motion will be granted in part and

denied in part.

**BACKGROUND**

For purposes of deciding this summary judgment motion, the Court relies only on those facts that are undisputed, and on those facts that a reasonable fact-finder, taking the evidence in the light most favorable to the plaintiff, could find.  The account below sets forth the undisputed facts, and identifies those matters on which the evidence is conflicting.

Plaintiff Charles J. Brady is a 54-year-old graduate of the United States Military Academy at West Point, and a "Vietnam War Era Veteran."  (Brady Aff. ¶¶ 3-4.)[1]  After his military service, he earned an MBA degree from the University of Chicago School of Business.  (Id. ¶ 5.)  Brady currently holds multiple licenses to work in the securities industry, and is registered with and licensed by both the New York Stock Exchange ("NYSE") and National Association of Securities Dealers ("NASD").  (Id. ¶ 6.)

In February 1999, Brady was hired by Credit Lyonnais Securities (USA) ("CLS"), a broker-dealer incorporated in New York, as an equity analyst covering the automotive and related industries.  (Id. ¶ 7; Brady Dep. 74.)  When he was hired, Brady was 45 years old.  (Hayes Aff. ¶ 15.)  In May 2004, the corporate parent of CLS was acquired by a French company, Credit Agricole, S.A.  As a result of the merger, Calyon was born, and CLS was renamed Calyon Securities (USA).[2]  (Pages Aff. ¶ 2.)  Francois Pages was the Chief Executive

---

[1] Brady served in the United States Army from June 1975 until September 1980 and was honorably discharged, but he never served in Vietnam.  (Brady Dep. 47-48.)

[2] Although Brady was employed by both Credit Lyonnais Securities (USA) and Calyon Securities (USA), for the sake of simplicity, this Opinion will refer to both companies collectively as "CLS."

Officer of CLS at all times during Brady's employment.[3]  (Id. ¶ 3.)

When he was hired, Brady signed an offer letter that set his compensation and certain revenue-based additional compensation for 1999 only, and provided that he would be "eligible for a discretionary bonus in 1999." (Brady Dep. Ex. F.)  Brady was also provided an Employment Handbook and signed an acknowledgment agreeing to be bound by its policies. (Brady Dep. 277.)  However, with the exception of the limited offer letter, CLS did not provide Brady with a written employment contract.  (Hayes Dep. 83.)

When he was hired, CLS also provided Brady with a Compliance Manual (Brady Dep. 278), which "memorialized [CLS's] adherence to [the NYSE's and NASD's] rules and regulations" (Howard Dep. 35-36).  The Compliance Manual also instructed employees to speak with George Howard, CLS's Director of Compliance, if they had questions or needed help in understanding the NYSE and NASD rules as they applied to CLS.  The Compliance Manual has been amended a number of times since Brady was hired.  (Billet Dep. 32; see Howard Dep. 36-37 (stating that the Compliance Manual is updated "[a]ll the time").)

Brady received favorable performance evaluations in 2000 and 2001.  (Pl. Exs. P & Q.) In 2001, CLS promoted Brady, then age 48, to the position of Director of Research.  (Pages Aff. ¶ 4; Hayes Aff. ¶ 8.)  In that position, Brady had a staff of research analysts reporting to him (Schindler Dep. 33-34), and Brady in turn reported directly to Eric Schindler.  (Brady Aff. ¶ 16; Schindler Dep. 29, 31-32; Hayes Dep. 143; Howard Dep. 64; Pages Dep. 87-88.)  Although Schindler's official title is in dispute, it is undisputed that Schindler had supervisory

_____

[3] CLS claims that Pages made the decision to hire Brady, but Brady disputes that claim, asserting instead that he was hired by Jeffrey Posner and Pierre LaPomme.  (Brady Dep. 232; see Pl. Ex. 16.)

responsibilities over the staff in both the Investment Banking Department and Research

Department, including Brady.[4]  (See Pages Dep. 46-47; Schindler Dep. 53.)

According to Brady, the environment at CLS became increasingly tense during the first

days of the U.S. invasion of Iraq.  When France announced in early 2003 that it would not

support the U.S. invasion, CLS's Human Resources Department received a report of

inappropriate jokes by CLS employees relating to the controversy.  (Hayes Dep. 56.)  In

response, CLS Human Resources distributed a memo reminding CLS employees that

"inappropriate and unlawful behavior," including anti-American, anti-French, and anti-Semitic

remarks, "would not be tolerated."  (Brady Dep. Ex. JJ.)  Although Human Resources did not

conduct an official investigation into the accusations, there were no further reports of

"inappropriate and unlawful behavior" after circulation of the memo.  (Hayes Aff. ¶ 9.)

Around the same time, Brady told Pages that as a West Point graduate, he received

emails from his former classmates discussing the Iraq situation.  (Brady Dep. 251; Howard Dep.

Ex. 9; Pages Aff. ¶ 5.)  On April 9, 2003, Brady forwarded one of those emails to Pages with the

note, "[t]hought you might be interested . . . ."  (Howard Dep. Ex. 9.)  According to Brady, the

relationship between himself, Pages, and Schindler became increasingly strained during this time

due in part to their differing opinions on the war.  (Brady Dep. 253-55; id. 292-94; Brady Aff. ¶

20.)

_____

[4] CLS has previously held Schindler out to be both Head of Investment Banking and
Managing Director.  (See Pl. Ex. 15.)  However, CLS claims that, notwithstanding this
representation, Schindler was actually the director of CLS's "U.S. efforts," and not the Head of
Investment Banking (Howard Dep. 202; see Schindler Dep. 23), which CLS claims was Libby
Ladu (Pages Dep. 67).

Also around the same time, CLS began cutting staff in anticipation of the merger of its parent with Credit Agricole.  (Pages Aff. ¶ 6.)  Schindler, who supervised the departments that were being downsized, was responsible for making the cuts.  (Brady Dep. 81.)  Nearly 100 employees were terminated in early 2003, including a number of research analysts in Brady's department, and thereafter a hiring freeze was imposed.  (Hayes Aff. ¶ 10; Pages Aff. ¶ 6; see id. ¶ 12 (claiming that Brady had "vigorously fought any reduction of his staff and was openly critical of institutional business decisions and strategy during a difficult period").)

In June 2003, Brady began looking for other jobs.  (Brady Dep. 132.)  He received an offer from Independent Research, another securities firm.  (Id.)  On June 22, 2003, Brady met with Pages to submit his resignation.  (Id. 136-37; Pages Aff. ¶ 7.)  However, Brady retracted his resignation when Pages agreed to increase his salary to $200,000 and recommend him for a bonus of $300,000, for a total compensation of $500,000.[5]  (Pages Dep. 93-95; Pages Aff. ¶ 7.)  Schindler supported the decision to promote Brady (Schindler Dep. 100), although he did not consult with Pages prior to the promotion (id. 114).

According to Brady, Pages also agreed during their June 22 conversation to respond to concerns Brady allegedly expressed about his reporting directly to Schindler.  Brady claims that he told Pages at the June 22 meeting that his reporting relationship to Schindler violated NYSE and NASD rules prohibiting the same person from supervising both the investment banking and research functions of a broker-dealer firm.  (Brady Dep. 137-44.)  Brady claims that he decided

---

[5] Pages claims that Brady demanded the $300,000 bonus in return for the retraction of his resignation, which Pages felt constituted "blackmail," as CLS was under a hiring freeze at the time and so Pages would have been unable to replace Brady.  (Pages Dep. 98.)  Brady disputes this interpretation of the conversation, and claims that he never asked Pages to "guarantee" the bonus.  (Brady Dep. 137.)

to remain at CLS only because Pages assured him that he "would immediately take corrective action so that the Research Department and [Brady] in particular would not be subject to the supervision and control of Eric Schindler."  (Brady Aff. ¶ 21.)  Pages denies that he made any such promise to Brady, or that Brady raised that concern either during their June 22 conversation or at any time during Brady's employment.  (Pages Dep. .)  Both Howard and Schindler also deny that Brady ever made any such complaints before the day he was terminated.  (See Howard Aff. ¶ 8; Schindler Dep. 74; see also Billet Aff. ¶ 10.)

On February 5, 2004, Brady received a performance grade for 2003 of "minus 3," indicating that his performance in 2003 had been less than satisfactory.  (Brady Dep. Ex. Z.)  Schindler, as Brady's direct supervisor, had originally given Brady a grade of "3," and suggested several ways in which Brady could improve his performance.  (Id.; see Schindler Dep. 144, 180-81.)  Pages added the "minus" to Brady's grade, to reflect that Pages "expect[ed] much more from Charles as a leader of the Research department . . . ."  (Pages Aff. ¶ 11; see id. ¶ 12 ("In lowering [Brady's] rating, I was mindful that in June 2003 [Brady] had made demands for promotion and additional compensation, and I expected a significantly higher level of performance from [Brady] to correspond to his higher title and compensation level.").)  The 2003 review was Brady's first performance review since 2001, and the first review he received at CLS that was not above average.  (Brady Dep. Exs. P-Q.)  However, despite the less than satisfactory performance review, on March 12, 2004, Brady received a $300,000 bonus, as discussed at the June 22 meeting.  (Pl. Ex. 17.)  Bonuses at CLS are discretionary, based on a variety of factors, including "the way someone performs."  (Hayes Dep. 24-25.)

On July 1, 2004, Brady gave Howard a handwritten, undated, unaddressed, unsigned letter.  (Pl. Ex. 19.)  The letter complained about the alleged "reporting impropriety" Brady claimed to have discussed with Pages in June 2003.  (Id.)  Specifically, Brady stated that he, "as head of research . . . should not be reporting to Eric Schindler, . . . [as] head of banking," and that he had been "castigated" for taking the issue "to [Pages's] attention."  (Id.)  Brady also claimed in the letter that Pages had promised him at the June 2003 meeting to "resolve[]" the reporting issue, but the issue had not been resolved.  (Id.)  Finally, Brady accused Schindler of telling Brady that he would "pay for running to [Pages] and complaining last summer."  (Id. (internal quotation marks omitted).)  Brady – then age 50 – was terminated later that day and immediately replaced by Michael Weinstein, a 45-year-old American who had previously been a Director of Research at another firm.[6]  (Pages Aff. ¶¶ 15, 17.)

Brady was offered $50,000 in severance in return for signing a general release, including a release of any legal claims Brady might have against CLS, by August 1, 2004.  (Pl. Ex. 11; see Hayes Dep. 199.)  Brady did not sign the release by August 1, and as a result, CLS rescinded the offer.  (Id.)  On August 13, 2004, CLS filed a Form-U-5 with NASD stating the reason for Brady's termination as "performance."[7]  (Brady Dep. Ex. UU; see Hayes Dep. 146 (claiming that Pages had terminated Brady "because of his leadership skills").)

---

[6] CLS had lifted the aforementioned hiring freeze in May 2004, following the merger of its parent company with Credit Agricole, S.A., thereby allowing Pages to replace Brady with Weinstein.  (Pages Aff. ¶ 14.)

[7] A Form U-5 is "file[d] to indicate th[e] termination of the relationship between the firm and someone in a [NASD-]registered capacity . . . ."  (Billet Dep. 73.)

On April 4, 2005, Brady filed suit in this Court, contending that defendants (1) unlawfully retaliated against him in violation of NYSE and NASD regulations, and in violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A; (2) breached their implied contract with Brady by wrongfully discharging him in violation of both the Employee Handbook and the Compliance Manual's whistleblower provision; (3) discriminated against him on the basis of age, national origin, and military status; (4) tortiously interfered with his ability to secure new employment; (5) fraudulently induced him to remain in his job in June 2003; and (6) failed to pay him for his unused vacation days after his termination.

On November 8, 2005, the Court dismissed plaintiff's retaliation claims, finding, inter alia, that the regulations at issue did not provide for a private right of action, and that, as an employee of a non-publicly traded company, Brady was not protected by the Sarbanes-Oxley Act.  Brady v. Calyon Secs. (USA), 406 F. Supp. 2d 307, 312-14, 317-19 (S.D.N.Y. 2005).  In addition, the Court dismissed plaintiff's tortious interference and fraudulent inducement claims, finding that plaintiff had not stated a claim for either cause of action.  Id. at 314, 317.  Finally, the Court dismissed Brady's breach of implied contract claim insofar as it was based on an alleged violation of the Employee Handbook, finding that Brady was an at-will employee and that the Handbook did not create an implied contractual relationship between CLS and Brady. Id. at 315.  However, although the Court noted that defendants had "persuasively" argued that the Compliance Manual's whistleblower provision similarly did not create an implied contract between CLS and Brady, the Court declined to dismiss that claim to provide plaintiff the opportunity to take discovery on the issue.  Id.

On May 14, 2007, defendants moved for summary judgment on plaintiff's remaining breach of contract and discrimination claims, arguing, inter alia, that the evidence uncovered during discovery conclusively establishes that Brady was not protected from termination by the whistleblower provision, and that he was terminated for legitimate, non-discriminatory reasons. Plaintiff responded on June 15, 2007; the motion was fully briefed as of June 25, 2007.

## DISCUSSION

### I.      Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©.  The Court's responsibility is to determine whether there is a genuine issue to be tried, and not to resolve disputed issues of fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The Court must draw all reasonable inferences and resolve all ambiguities in the nonmoving party's favor, and construe the facts in the light most favorable to the nonmoving party. Id. at 254-55.  However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (citations omitted).

The party seeking summary judgment bears the burden of showing that no genuine factual dispute exists. See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).  Once the moving party has made a showing that there are no genuine issues of material fact, the burden shifts to the nonmoving party to raise triable issues of fact. Anderson, 477 U.S. at 250. A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in

favor of the nonmoving party.  Id. at 248.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight
Line Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) ("If . . . there is any evidence in the record from
which a reasonable inference could be drawn in favor of the opposing party, summary judgment
is improper.") (citation and internal quotation marks omitted).  In addition, "conclusory
statements or mere allegations [are] not sufficient to defeat a summary judgment motion."  Davis
v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002); see also id. ("The nonmoving party must
go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to
interrogatories, and admissions on file, designate specific facts showing that there is a genuine
issue for trial.") (alterations in original) (citation and internal quotation marks omitted).

## II.    Breach of Contract

Plaintiff asserts a claim for breach of contract under New York law, arguing that he was
fired in breach of promises made in CLS's Compliance Manual that he claims form a part of his
employment contracts.  Defendants make several distinct attacks on this claim.  First, defendants
claim that plaintiff cannot invoke the protection of the Compliance Manual's whistleblower
provision because that provision was not written into the Manual until after plaintiff was
discharged.  Second, defendants argue that, even if the whistleblower provision did exist during
the term of plaintiff's employment, he cannot avail himself of its protection because he did not
make any good faith complaints during the term of his employment.  Finally, defendants argue
that, even if plaintiff did make such complaints during the term of his employment, he was
discharged for legitimate, non-retaliatory reasons.  Although plaintiff has submitted scant
evidence supporting his contract claim, relying mostly on his own affidavit and deposition
testimony to create a genuine issue of material fact, defendants have nonetheless failed to

establish that a reasonable trier of fact could not accept plaintiff's testimony and find for plaintiff

on his breach of contract claim.  Therefore, summary judgment on this claim must be denied.[8]

    A.      Whistleblower Provision

    The governing legal principles are not in dispute.  It is "settled law in New York that,

absent an agreement establishing a fixed duration, an employment relationship is presumed to be

a hiring at will, terminable at any time by either party."  Sabetay v. Sterling Drug, Inc., 69

N.Y.2d 329, 333 (1987). See also Dalton v. Union Bank of Switz., 520 N.Y.S.2d 764, 765 (1st

Dep't 1987) ("Plaintiff's employment was not for a specified period of time and, therefore, the

hiring is presumed to be an employment at will.").  Without a formal contract, a plaintiff can not

bring a claim of wrongful discharge based on common-law tort theory.  Murphy v. Am. Home

Prods. Corp., 58 N.Y.2d 293, 300 (1983); see Mulder v. Donaldson, Lufkin & Jenrette, 623

N.Y.S. 2d 560, 563 (1st Dep't 1995) ("[A]n employee . . . may be terminated . . . at any time, for

*any* reason or even for *no* reason.") (emphasis in original).  However, "New York law carves out

. . . a few very narrow exceptions to the at-will employment doctrine."  Brady, 406 F. Supp. 2d at

314.  Specifically, an employer in New York may not terminate an employee where such

termination violates "an express limitation in the applicable contract of employment."  Mulder,

623 N.Y.S.2d at 563.

_____

    [8] Because the Court has jurisdiction on the basis of diversity of citizenship, 28 U.S.C. §
1332(a)(1), there is no need to exercise supplemental jurisdiction over plaintiff's state law
breach of contract claim.  (See Am. Compl. ¶ 14.)  In any event, even if diversity jurisdiction
were not present, it would be appropriate to exercise supplemental jurisdiction over plaintiff's
breach of contract claim would be proper, despite the dismissal of plaintiff's federal claims, as
the specific contract term that was allegedly breached is intended to promote compliance with
rules adopted pursuant to federal securities laws, thus creating a particular federal interest in this
case.

Here, Brady does not claim that he had a written contract specifying a time period for his employment, and thus is presumed to be an at-will employee.  <u>Brady</u>, 406 F. Supp. 2d at 314. However, Brady asserts that the whistleblower provision in the Compliance Manual constitutes an "express limitation" on CLS's ability to discharge its employees.  The whistleblower provision at issue provides that "[e]mployees are entitled to protection from retaliation for having, in good faith, made a complaint" regarding CLS's compliance with securities laws and regulations, including NYSE and NASD rules.  (Pl. Ex. 5.)  The whistleblower provision further provides that CLS "shall not discharge, demote, suspend, threaten, harass, or in any manner discriminate against an employee in the terms of conditions of employment based upon any lawful actions of such employee with respect to good faith reporting of complaints."  (<u>Id</u>.)  Thus, plaintiff argues that the whistleblower provision creates an implied contractual relationship between CLS and its employees, and therefore that a violation of that provision amounts to a breach of contract.

Defendants do not dispute plaintiff's interpretation of the whistleblower provision as creating an implied contract between CLS and its employees.  Indeed, any such dispute would be futile, as several New York state and federal courts have found that a whistleblower provision such as that found in the Compliance Manual is an "express limitation" on an employer's ability to discharge its employees.  <u>See Mulder</u>, 623 N.Y.S. 2d at 564; <u>see</u>, <u>e.g.</u>, <u>Albert v. Losken</u>, No. 96 Civ. 219, 1996 WL 571112, at *3 (E.D.N.Y. Sept. 11, 1996); <u>Gorman v. Nat'l Med. Care, Inc.</u>, No. 103604-95, 1998 WL 1050970, at *3 (Sup. Ct., N.Y. County, Aug. 13, 1998). However, defendants argue that the whistleblower provision on which plaintiff relies was not instituted until after plaintiff was discharged.  Specifically, defendants claim that the

whistleblower provision was put in force in November 2004, "as part of a post-acquisition policy directive from Credit Agricole in Paris." (Billet Aff. ¶ 3.) This is a key distinction; if the whistleblower provision was not instituted until November 2004, then it did not exist during the term of plaintiff's employment, and plaintiff cannot rely on it to support his breach of contract claim.

As an initial matter, plaintiff argues that defendants are merely trying to take "another bite of the apple" on plaintiff's breach of contract claim here, and that "[t]he same argument was made by the [d]efendants and rejected in the earlier motion to dismiss." (Pl. Mem. 13.) Plaintiff is mistaken. The Court did not previously reject this argument, but only deferred judgment on it until after plaintiff could take discovery on whether the whistleblower provision was in place during plaintiff's employment. See Brady, 406 F. Supp. 2d at 316 (characterizing defendants' argument as "persuasive[]," but stating that "[p]laintiff has alleged sufficient facts to state a claim of an implied contract that would lead to an express limitation of at-will employment").

Although defendants have submitted substantial evidence showing that the whistleblower provision was not instituted until after plaintiff was discharged, they have not met their summary judgment burden here. Instead, a jury could reasonably find that the whistleblower provision was in existence before plaintiff was discharged. Defendants submit the testimony of Howard, CLS's Director of Compliance, and Christian Billet, CLS's Compliance Officer, who both testify that the whistleblower provision was put in force in November 2004, after plaintiff was discharged. (Billet Aff. ¶ 3; Howard Dep. 46.) In contrast, however, plaintiff submits his own deposition testimony countering this assertion, and claiming that Howard represented to him that the whistleblower provision was in effect since at least 2003. (Brady Dep. (161 ("[Howard] said

13

'We have stuff like that.  It's written in . . . the compliance manual.  I said, 'Are they going to

live by that George?'  And he says, 'They have to.'".)  A trier of fact could reasonably find that

plaintiff's failure to submit the testimony of any other CLS employee supporting his contention

that the whistleblower provision was in existence before he was discharge weighs heavily

against his own testimony.  However, plaintiff's failure to submit any testimony (besides his

own) in support of his argument does not preclude a reasonable trier of fact from crediting his

testimony over that submitted by defendants, and it is not the Court's responsibility to resolve

credibility disputes on a motion for summary judgment.  See Jeffreys v. City of New York, 426

F.3d 549, 553 (2d Cir. 2005).

　　　　In addition to the testimony of CLS management, defendants submit documentary

evidence supporting their contention that the whistleblower provision was only instituted after

plaintiff was discharged.  Specifically, defendants submit a version of the Compliance Manual

dated November 1998, which does not include the whistleblower provision, claiming that this

was the version of the Manual that plaintiff received when he was hired.  (Defs. Ex. GGG.)  In

addition, defendants submit the text of the whistleblower provision itself, which includes a

notation on the bottom of the page stating "Reissued 11/04."  (Howard Dep. Ex. 5.)  Although

this documentary evidence weighs heavily in favor of defendants, it is not conclusive proof that

the whistleblower provision did not exist during plaintiff's employment.

　　　　First, it is undisputed that the copy of the Compliance Manual submitted to the Court by

defendants was not the same copy provided to Brady when he was hired, but instead was printed

from CLS's internal computer system for purposes of this litigation, and plaintiff denies that this

was the version of the Compliance Manual that he received when he was hired.  A jury could

reasonably find that Brady's failure to produce the Compliance Manual he received when he was hired weighs against his argument, but this type of authenticity issue is properly resolved by the fact-finder at trial, and not by the Court on summary judgment.  See Bazak Int'l Corp. v. Tarrant Apparel Group, 378 F. Supp. 2d 377, 392 (S.D.N.Y. 2005).

Defendants further argue that, because the page of the Compliance Manual on which the whistleblower provision appears includes a notation that says "Reissued 11/04," a reasonable fact-finder could not determine that the provision was instituted prior to November 2004.  But an examination of the page does not indicate what precisely was "[r]eissued" in November 2004. That the page was "*re*-issued" in 2004 suggests the possibility that the whistleblower provision existed before that date, and had been revised in some unspecified way at that time.  Moreover, another notation on the same page states "Revision # 5.0.a," thus showing that the Manual had been revised at least five times since it was created in 1998, without a corresponding notation showing which sections have been revised at which times and which were part of the original Manual.  (Id.; see Howard Dep. (37 (stating that the Compliance Manual is updated "[w]henever there's a change [CLS] feel[s] is necessary").)  The documentary evidence could be read as defendants prefer, but it is not conclusive.  A reasonable trier of fact could find that the "Reissued 11/04" notation does not refer specifically to the whistleblower provision, but to the re-issuance of the Compliance Manual generally after a revision of a different section.[9]

---

[9] Plaintiff also submits an "[a]ppendix" to the Compliance Manual that describes the whistleblower provision in greater detail, with a notation on the bottom of the page stating "Rev. January 2005."  (Pl. Ex. 6.)  However, once again, it is unclear from an examination of the appendix alone exactly what was revised in January 2005; thus, the notation does not conclusively establish that the whistleblower provision was not instituted until after plaintiff was discharged.  A reasonable jury could find that the fact that the whistleblower provision itself is dated November 2004 while the appendix describing the provision in detail is dated January

Although summary judgment is not warranted here, plaintiff's argument is hardly compelling.  Plaintiff relies entirely on his own testimony in support of his argument that the whistleblower provision existed when he was employed at CLS, while defendants submit the testimony of employees with personal knowledge of the issue – including CLS's Compliance Director – countering that assertion, along with significantly persuasive documentary evidence. The only testimony (besides his own) that plaintiff claims supports his argument is that of Donna Hayes, a human resources manager at CLS, but plaintiff's description of that testimony misinterprets the record.  Plaintiff claims that Hayes's testimony supports his argument that the whistleblower provision existed since 1998, asserting that Hayes testified during her deposition that it was her "understanding that employees will not be retaliated against because they made complaints," which is based on a policy that had been in place since 1998.  (Pl. Mem. 15, quoting Hayes Dep. 32.)  But the context of Hayes's testimony belies plaintiff's claim.  In stating that CLS had a policy against retaliation for complaints, Hayes was clearly referring to CLS's policy against complaints about discrimination or sexual harassment, and not about complaints regarding CLS's compliance with securities laws.  (Hayes Dep. 29-33.)  Plaintiff's suggestion that the subject of Hayes's testimony was unclear strains credulity, considering that Hayes's answer was elicited in response to specific questions regarding CLS's anti-discrimination policies, not CLS's compliance with securities laws.  (See Hayes Reply Aff. ¶ 3; see, e.g., Hayes Dep. 45 ("Are you aware that the EEOC publishes materials that guide employers in retaliation and discrimination issues?").)

---

2005 reflects an inconsistency in defendants' argument that the whistleblower provision was fully instituted in November 2004, and creates the possibility that the provision had existed previously and simply was frequently revised.

Yet, although plaintiff sets forth very little evidence in support his claim, on summary judgment the burden is not on plaintiff to prove his case, but on defendants to demonstrate that no genuine issue of fact exists for trial.  See Giannullo v. City of New York, 322 F.3d 139, 140-41 (2d Cir. 2003) (on summary judgment, a plaintiff "is not required to rebut an insufficient showing").  In this case, although defendants have submitted substantial evidence in support of their claim that the whistleblower provision was not instituted until after plaintiff was discharged, defendants' evidence is nevertheless insufficient to hold that a reasonable trier of fact could not determine the issue in plaintiff's favor.  See Fleming v. Am. Home Prods. Corp., No. 91 Civ. 2348, 1992 WL 183756, at *1 (S.D.N.Y. July 21, 1992) (denying summary judgment on employment discrimination claim, "[n]otwithstanding that plaintiff's case is weak").[10]

B.      Good Faith Complaints

Next, defendants argue that, even if the whistleblower provision was instituted prior to plaintiff's discharge, plaintiff was nonetheless not protected by that provision because he never made any good faith complaints to defendants about potential violations of NYSE and NASD rules by CLS.  Plaintiff does not specifically address this argument, but merely states that "at the very least an issue of fact exists on this issue."  (Pl. Mem. 15.)  Despite plaintiff's cursory

---

[10] Defendants also argue that, during deposition, plaintiff cited "irrelevant" provisions of the Compliance Manual to support his contract claim, which defendants argue do not create an implied contract as a matter of law.  (Defs. Mem. 11.)  However, even if plaintiff referred during his deposition to other provisions of the Compliance Manual that he believed created a contract between himself and CLS, it is clear from the papers plaintiff submitted in connection with this motion that he relies solely on the whistleblower provision to create the contractual relationship. (See Pl. Mem. 14 ("[T]he only issue that remains [with respect to plaintiff's breach of contract claim] is whether the anti-retaliation policy was in effect during [p]laintiff's employment.").)

briefing of the issue, the Court agrees.

Plaintiff claims that his reporting relationship with Schindler violated NYSE and NASD rules.  Specifically, plaintiff claims that, as Head of Investment Banking, Schindler was prohibited by NYSE Rule 2711 ("Rule 2711") and NASD Rule 472 ("Rule 472") from having any supervisory responsibilities over employees in the Research Department, including plaintiff. Plaintiff claims that he was discharged, not because of his performance, but because he complained about this reporting relationship, and that his discharge was therefore a violation of the whistleblower provision, which protects employees from retaliation for registering "good faith" complaints of potential violations of securities rules and regulations.

Defendants argue that a reasonable jury could not find that plaintiff ever complained about his reporting relationship with Schindler until the day he was terminated, and that the complaint he made on that date was not made in good faith, but instead was a response to his imminent termination.  Defendants' arguments fail to warrant summary judgment in their favor.

First, the written complaint submitted by Brady on July 1 is alone enough to allow plaintiff to survive summary judgment here.  On July 1, 2004, plaintiff submitted a letter to Howard, CLS's Director of Compliance, complaining about the reporting relationship between himself and Schindler, and claiming that Schindler threatened to retaliate against him for complaining to Pages about the issue the previous summer.  Plaintiff was terminated shortly thereafter that same day.  Defendants argue that plaintiff's July 1 complaint was not made in good faith, but instead was merely an attempt by plaintiff to protect himself from discharge, which defendants claim plaintiff knew about prior to July 1.  But defendants have presented no evidence establishing that plaintiff knew about his impending termination when he submitted his

complaint, and plaintiff disputes that he had any such knowledge.[11]  A reasonable trier of fact

could certainly find that the fact that the July 1 letter was handwritten, unaddressed, unsigned,

undated, and looks as if it was scribbled in haste, combined with the fact that plaintiff was

terminated later the same day weighs in favor of defendants' argument that the letter was only a

last-ditch attempt by plaintiff to protect himself from his imminent termination and was not a

good faith complaint.  However, a reasonable trier of fact could find that plaintiff neither knew

about his termination, nor, based on his recent $300,000 bonus and several years of positive

performance reviews, reasonably expected to be terminated when he submitted the letter, and

thus that he did not have an ulterior motive in submitting the letter, but instead submitted it in the

good faith belief that CLS had been violating the relevant rules.  Because resolution of this issue

turns on drawing inferences from the evidence and assessing credibility, the question must be

decided by a jury and not on summary judgment.[12]

Second, wholly apart from the July 1 complaint, summary judgment would still not be

warranted here, as a reasonable jury could find that plaintiff had previously registered good faith

complaints about the same issue during the course of his employment.  Although defendants

submit the deposition testimony and affidavits of several members of CLS's management

alleging that plaintiff never complained about his reporting relationship with Schindler prior to

---

[11] Plaintiff claims that his decision to submit the letter was precipitated, not by knowledge of his termination, but by a conversation he had with a friend that he met on the street earlier that day.  (Brady Dep. 95-96.)

[12] Even if Brady's July 1 complaint was made in good faith, however, to prevail on his breach of contract claim he would nevertheless be required to show that CLS terminated his employment because of that (or other) good faith complaints, and not for legitimate, non-retaliatory reasons.  See Part II.C, infra.

the date he was terminated (Howard Aff. ¶ 5; Howard Dep. 140; Schindler Dep. 74; Pages Dep. 121), plaintiff submits his own testimony and the testimony of another CLS employee claiming that he did make such complaints several times since 2002, when he first began reporting to Schindler (see Brady Dep. 159-60, 180, 357; Zadell Aff. ¶ 4 ("At several of the Compliance meetings, Mr. Brady strongly argued for the separation of Research from Banking.")).[13]  It is the responsibility of the fact-finder at trial to determine what weight to afford the conflicting testimony submitted by the parties.

In addition, it is undisputed that plaintiff participated in at least one internal CLS audit which considered the applicability of Rule 472 and Rule 2711 to CLS, as well as at least one formal meeting with industry regulators about CLS's compliance with those rules.  (Howard Aff. ¶ 5; Billet Dep. 25.)  CLS argues that the fact that there are no written records of Brady's complaints from either the internal audit or the meeting with the regulators establishes that he never complained about his reporting relationship with Schindler, but a reasonable jury could find that Brady never put his complaints in writing for other reasons, for example, because Pages assured him that the problem would be rectified, or out of fear for his job.  Determining whether Brady actually complained about the reporting relationship between himself and Schindler is contingent on the weight given to the conflicting testimony in this case; such a credibility dispute is not appropriate for resolution on summary judgment.  See Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005) ("It is a well-recognized principle of our trial system that determining the weight and credibility of a [witness's] testimony . . . belongs to the jury . . . .")

---

[13] Moreover, Pages concedes that he does not remember all of the details of the June 22 meeting, during which plaintiff claims that he made a complaint directly to Pages and that Pages promised to correct the problem.  (Pages Dep. 164-65.)

(alterations in original) (citation and internal quotation marks omitted).

Moreover, defendants have submitted almost no documentary evidence supporting their contention that Brady did not register any good faith complaints that his reporting relationship with Schindler violated NYSE and NASD rules. Defendants submit one e-mail as documentary support of their contention, but that e-mail is hardly conclusive proof that Brady did not believe in good faith that his reporting relationship with Schindler violated NYSE and NASD rules. In that e-mail, in response to a question by Pages about proposed new rules concerning the relationship between the Research Department and Investment Banking Department, plaintiff states that CLS was operating "within the spirit" of certain new, unspecified securities regulations. (Pages Dep. Ex. 19.) However, the e-mail was written in highly general terms and does not specifically refer to Rule 472 or Rule 2711 – therefore, a reasonable fact-finder could determine that Brady was not referring to those rules in this exchange. Moreover, the fact that Brady may at one time have thought that CLS was operating "within the spirit" of the NYSE and NASD rules does not establish that his opinion did not change over time. Although a jury might find that the e-mail weighs against Brady's contention that he always believed his reporting relationship with Schindler violated the NYSE and NASD rules, the weight to give that e-mail should be determined by a jury at trial, and not by the Court on summary judgment.[14]

---

[14] Moreover, another e-mail submitted by defendants, in which plaintiff asks Howard what his "feelings" were about whether a member of the commercial banking department was permitted to "preview a research report" produced by an analyst in his department actually supports plaintiff's contention, insofar as it shows that plaintiff was concerned about the relationship between the Research Department and the Investment Banking Department as early as April 2003. (See Howard Dep. Ex. 7; see also Pl. Ex. 14 ("[The NYSE and NASD rules are] becoming more and more complicated[.] [Y]ou basically just have to follow the rules and really know your stuff!").)

Essentially, defendants' argument relies not on what *is* in the record, but on what *is not* in the record.  According to defendants, upon reviewing "thousands of pages of documents and emails in the record," they could not find any written complaints or notes of meetings in which Brady complained about CLS's compliance with Rule 472 and Rule 2711.  (Defs. Mem. 13.)  In addition, defendants argue that plaintiff himself has not submitted any documentary evidence supporting his claim that he complained to CLS prior to July 1, 2004, even though he testified that "he retained copies of written communications that he thought were 'truly significant.'" (Defs. Mem. 13 n.19, quoting Brady Dep. 58.)  But defendants concede that many meetings at CLS take place without a written record (Howard Dep. 29); thus, a reasonable jury could credit Brady's deposition testimony and find, for example, that Howard promised Brady that CLS would not retaliate against him for complaining about his reporting relationship with Schindler, even without a written record of that conversation.

Although plaintiff relies mostly on his own testimony, of which a jury may well be skeptical, to oppose defendants' motion, a reasonable jury would be within its rights to accept that testimony, and find that plaintiff had registered good faith complaints about his reporting relationship with Schindler prior to his termination.  Therefore summary judgment is not warranted here.

C.      Legitimate, Non-Retaliatory Discharge

Finally, defendants argue that, even if plaintiff did register good faith complaints about his reporting relationship with Schindler, a reasonable jury could not find that those complaints were the reason for his termination.  Specifically, defendants argue that a reasonable trier of fact would be required to find as a matter of law that Brady was terminated due to poor performance,

and not due to any good faith complaints.  Again, plaintiff fails to address this argument in his response to this motion.  Nevertheless, defendants have failed to show that a reasonable trier of fact could not find that plaintiff was discharged for retaliatory reasons.

According to defendants, plaintiff was discharged for several reasons, including his lack of managerial skill (Pages Dep. 136-37; Schindler Dep. 112), his personality conflict with Schindler (Ruel Aff. ¶ 2), his illegitimate and unreasonable dissatisfaction with CLS's decision to cut employees from his staff and CLS's failure to pay significant bonuses to members of the Research Department (Schindler Dep. 180-81 (criticizing plaintiff's "very poor[]" handling of disgruntlement among his team)), and his failure to meet the standards Pages believed he should have met to justify his promotion and $300,000 bonus (Pages Aff. ¶ 12; <u>see</u> Hayes Dep. 151 (describing a conversation between Hayes and Pages about Brady's "passive" leadership)).  Defendants also submit e-mails indicating that plaintiff was not an efficient or effective Director of Research.  (<u>See</u> Howard Dep. Ex. 10; <u>see</u>, <u>e.g.</u>, Rule Aff. ¶¶ 3-4 .)  In addition, defendants claim that plaintiff's 2004 performance review, in which plaintiff received a "minus 3" rating, establishes that plaintiff's performance during the previous year was "unsatisfactory."  (Pages Aff. ¶ 11; <u>see</u> Brady Dep. Ex. Z ("[W]e are disappointed with the way Charles has been managing and guiding his team.  His style of management is too passive. . . .  Charles is expected to show clear improvement in these areas.").)

However, although this evidence of plaintiff's poor work performance favors defendants, defendants nevertheless fail to establish that a reasonable jury could not find that defendants' professed reason for plaintiff's termination was merely a pretext for a retaliatory motive.  First, defendants fail to fully reconcile why plaintiff was awarded a $300,000 bonus just two months

23

prior to his termination, if bonuses at CLS are discretionary and depend at least in part on an employee's performance.  (Schindler Dep. 105; Hayes Dep. 24-25; Pages Dep. 120-21.)  Pages contends that Brady's bonus was not based on his performance, but was provided only because Pages promised it to him in June 2003 in order to persuade Brady to stay in his job, which Pages characterized as "blackmail."  (Pages Dep. 120-21.)  But Pages also claims that he never actually promised the bonus to Brady, but only said that he would see if the compensation committee would approve the bonus.  (Pages Dep. 120.)  Moreover, if CLS was preparing to terminate Brady in the Spring of 2003 as claimed by Pages, or even if CLS was simply disappointed with Brady's performance at that time, then the $300,000 bonus appears anomalous.  A jury could reasonably be suspicious of claims that an unsatisfactory employee had the bargaining power to extort a $300,000 bonus by a threat to quit.  Thus, a jury could reasonably find that Brady's receipt of a large bonus shortly before his discharge undermines defendants' argument that he was discharged for performance reasons.

Moreover, plaintiff's own testimony counters defendants' contention that he was terminated for legitimate, business reasons.  In support of his argument that he was terminated for retaliatory reasons, plaintiff primarily relies on his allegation that Schindler actually told him that he was terminated, not because of his performance, but because of his complaints: "Eric Schindler clearly stated that he was terminating me for interfering with investment banking . . . and not for performance . . . ."  (Brady Dep. 306; see id. 298 (claiming that Schindler told him that he was terminated as "punish[ment] . . . for trying to get investment banking out of research's business").)  Schindler denies he made any such statement to Brady.  This type of "he-said, he-said" dispute is properly resolved by a jury at trial.

Finally, it is undisputed that, up until his performance review in 2004, Brady had never received a negative performance review at CLS, and the negative review itself was abruptly altered from a +3 to a -3, which might call its objectivity into account.  While a reasonable jury could accept Pages' testimony that, as Research Director, Brady was expected to meet a higher effectiveness standard than he had previously been expected to meet as a research analyst, and therefore, that the fact that he had previously received favorable reviews as a research analyst does not undermine the credibility of his poor review as Research Director, a jury could instead find that the fact that Brady received a negative performance review at approximately the same time he alleges he made good faith complaints about his reporting relationship with Schindler weighs in favor of finding that his termination was retaliatory.

In sum, plaintiff may face an uphill battle to succeed on his breach of contract claim.  To find in his favor, a jury would have to believe not only that the whistleblower provision was in effect during his employment – even though the evidence strongly favors defendants' argument that the provision was only put in place after plaintiff was terminated – but that plaintiff actually made good faith complaints prior to his termination – even though plaintiff has no written record of such complaints prior to his July 1 letter – and that defendants' professed reason for Brady's termination was just a pretext for a retaliatory motive – even though defendants have submitted substantial evidence that plaintiff was terminated for legitimate, non-retaliatory reasons.  On most of these issues, moreover, his case depends on his own, largely uncorroborated, testimony. Nevertheless, however unlikely it may be that a jury would reach such a conclusion, the issue ultimately turns on credibility.  It is axiomatic that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary

judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

Accordingly, defendants' motion for summary judgment on plaintiff's breach of contract claim is denied.

## III.    Discriminatory Discharge

Next, plaintiff claims that defendants discharged him, not because of his poor performance, but because of his age, national origin, and/or military service. This catch-all claim of discrimination is in some tension with his breach of contract claim, in which plaintiff alleges that he was discriminated against due to his alleged whistleblowing. Plaintiff is entitled to plead and attempt to prove alternative theories of liability. However, there is no evidence in the record supporting any of plaintiff's discrimination claims. Therefore, defendants' motion for summary judgment on plaintiff's discrimination claims will be granted.

### A.    Age and National Origin Discrimination

It is undisputed that plaintiff has no federal statutory claim for national origin or age discrimination because he did not file an EEOC charge or receive a right to sue letter, as required by the Age Discrimination in Employment Act and Title VII. See 29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5; 29 C.F.R. § 1601.28. Therefore, plaintiff's national origin and age discrimination claims arise only under the New York State Human Rights Law ("SHRL"), N.Y. Exec. L. § 296(1)(a), and the New York City Human Rights Law ("CHRL"), N.Y.C. Admin. Code § 8-107(1). However, because both SHRL and CHRL claims are analyzed in the same manner as Title VII and ADEA claims, Cruz v. Coach Stores, Inc., 202 F.3d 560, 565 n.1 (2d Cir. 2000), plaintiff's age and national origin discrimination claims are analyzed under the three-part burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

26

To set forth a prima facie case of age or national origin discrimination, plaintiff must show that his termination arose under circumstances "giving rise to an inference of discrimination." Stephenson v. Hotel Employees and Restaurant Employees Union Local 100 of the AFL-CIO, 6 N.Y.3d 265, 270 (2006). Plaintiff may establish an inference of discrimination either through direct evidence, such as age-based or national origin-based derogatory comments, or indirect evidence, such as differential treatment of similarly situated employees outside of the protected class. Holtz v. Rockefeller & Co., 258 F.3d 62, 82 (2d Cir. 2001). Defendants are then given the opportunity to proffer legitimate, non-discriminatory reasons for the termination. Stephenson, 6 N.Y.3d at 271. Finally, the burden shifts back to plaintiff to show that defendants' professed reasons were a pretext for unlawful discrimination. Id. "[I]n order to defeat a motion for summary judgment," plaintiff must make only a "de minimis" showing of the elements of a discrimination claim. Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995).

Here, plaintiff has failed to meet even the "de minimis" standard of a prima facie discrimination claim; indeed, the evidentiary record is completely devoid of any facts which would permit a reasonable fact-finder to infer age or national origin discrimination in this case. First, plaintiff's age discrimination claim is unsupported by the record. Plaintiff bases his entire age discrimination claim on a handful of comments purportedly made by Schindler, in which Schindler allegedly referred to Brady as "the old man with all the wisdom," "the old man that is so knowledgeable in research," and allegedly once said to Brady, "[t]ake a lesson, old man." (Brady Dep. 297-99, 367.) But such isolated remarks alone are not enough to support a discrimination claim, especially where such comments are not even facially malicious or derogatory, but more likely just benign off-hand remarks that had little or nothing to do with

plaintiff's actual age and where "old man" was probably only being used in the colloquial sense. (See Brady Dep. 347 (conceding that people "use[] the tag 'old man' . . . on a basketball court . . . [and] in the classroom")).)  See Emanuel v. Oliver, Wyman & Co., 85 F. Supp. 2d 321, 335 (S.D.N.Y. 2000) (plaintiff failed to show a link between a "comment that [plaintiff] should 'stop shuffling around like an old man' and the decision to discharge him" because he did not "offer[] any evidence that the remark was made close to his discharge . . . [or] that the remark was related in any way to the decision to discharge him").

Moreover, the comments were allegedly made in February 2004, five months prior to Brady's termination, and therefore "were not temporally related" to plaintiff's discharge.  Del Franco v. N.Y. City Off-Track Betting Corp., 429 F. Supp. 2d 529, 537 (E.D.N.Y. 2006).  See Argueta v. North Shore Long Island Jewish Health Sys., Inc., No. 01 CV 4031, 2003 WL 22670915, at *9 (E.D.N.Y. Nov. 6, 2003) (no nexus when the discriminatory statements were made five months before defendants' decision to terminate plaintiff).  "Even when viewed in the light most favorable to plaintiff, these comments . . . are therefore insufficient to establish that plaintiff's discharge occurred under circumstances giving rise to an inference of age discrimination."  Del Franco, 429 F. Supp. 2d at 537.

Furthermore, it is undisputed that plaintiff – who never made any formal or informal complaint about Schindler's alleged comments[15] – was both promoted while he was in the

---

[15] In his response to defendants' Rule 56.1 Statement, plaintiff denies that he never complained about Schindler's age-based comments to Human Resources, as he was directed to do by the Employee Handbook.  (See Brady Dep. Ex. FFF at 0007.)  Plaintiff cites his own testimony in support of his argument, and states that he "complained to John Quinn and George Howard about the perceived discriminatory conduct."  (P. Opp'n to Defs. Local R. 56.1 Statement at ¶ 42, citing Brady Dep. 118-19, 159-60, 250-51.)  However, examination of the cited testimony reveals that plaintiff never testified during his deposition that he complained

protected age class, and replaced by another individual in the same protected class.  Plaintiff has

presented no explanation, credible or otherwise, why CLS would promote him while he was in

the protected age class and then terminate him a year later because of his age, nor has plaintiff

presented any explanation for why CLS would terminate plaintiff because of his age but replace

him with another individual in the same protected class, and indeed, only five years younger than

he.  "A reasonable juror could not infer discrimination under such circumstances."  Tishman v.

Associated Press, No. 05 Civ. 4278, 2007 WL 4145556, at *5 (S.D.N.Y. Nov. 19, 2007).

See Woodman v. WWOR-TV, Inc., 411 F.3d 69, 80 (2d Cir. 2005) ("[A] replacement decision

cannot be 'based on' the discriminatory criterion of age unless an employer . . . replaced an older

employee with a significantly younger one."); Pinkney v. EMI Music Pub., No. 02 Civ. 1944,

2006 WL 2456815, at *13 (S.D.N.Y. Aug. 22, 2006) (granting summary judgment on ADEA

claim to defendant-employer based in part on fact that plaintiff was hired when she was over 40

years old).

Finally, plaintiff has submitted no evidence indicating that other similarly situated

individuals outside of the protected class were treated more favorably than plaintiff.  Thus,

plaintiff has submitted neither direct nor indirect evidence supporting his age discrimination

claim, and therefore, plaintiff's age discrimination claim fails.

Plaintiff's national origin discrimination claim is similarly unsupported by the record.  In

support of this claim, plaintiff relies entirely on his allegations that, "[t]oward the end of 2002,

beginning of 2003," plaintiff sensed a "mood of . . . hostil[ity]" that "seemed" to reflect "a

French versus American sentiment," and that Pages allegedly told him that "he wasn't in favor of

_____

about Schindler's alleged age-based comments to Quinn, Howard, or any other CLS employee.

the [Iraq] war, [and] thought [the United States] had taken the wrong steps in advance of it, before the war[,] so he was just very negative on it."  (Pl. Mem. 18-19, quoting Brady 119, 252-53.)  According to Brady, when the Iraq war began, "there was this . . . us versus them, French versus American kind of thing" (Brady Dep. 253), and Pages "repeatedly brought up the subject of the war (Pl. Mem. 19-20, citing Brady Dep. 292), which made Brady uncomfortable (see Brady Dep. 294 (testifying that Brady "resented the topic being brought up")).  Brady claims that he complained to John Quinn, Director of Human Resources, about the alleged hostility.  (Brady Dep. 119.)

　　　None of these allegations create an inference that Brady's termination was motivated by a discriminatory bias.  First, even assuming there was an "anti-American sentiment" at CLS at the beginning of the Iraq war, and assuming Pages made the alleged statements, it is undisputed that these events all occurred "[t]oward the end of 2002, beginning of 2003."  (Pl. Mem. 18.)  Plaintiff was terminated in July 2004.  A reasonable jury could not infer that plaintiff's termination was discriminatory where over a year and a half passed between the alleged discriminatory conduct and his termination, during which time plaintiff was promoted and received a substantial bonus.  See Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (finding that twenty months between alleged discriminatory conduct and adverse employment action is insufficient to establish an inference of discrimination).

　　　Moreover, even assuming Pages made the alleged comments, there is no indication that the comments reflected anti-American sentiment, as opposed to particular political opinions. Plaintiff conflates Pages' opposition to the Iraq war with a discriminatory animus towards Americans themselves – the former is a form of protected speech, the latter is a prohibited basis

30

for employment decisions.  Plaintiff provides no reason for inferring an anti-American animus from Pages's alleged statements, except for his own "resent[ment]" at feeling compelled to discuss a controversial topic with his employer.  Discrimination law does not prohibit employers from having uncomfortable, or even ill-advised, discussions with their employees.  See Kravitz v. N.Y. City Transit Auth., No. 94-CV-5910, 2001 WL 1646513, at *7 (E.D.N.Y. 2001) (holding that a statement that "everyone has a good side" in response to a question about a survey that found that most Germans think Nazis had a good side does not give rise to an inference of discrimination; at most the comment was an "argumentative position [] on matters of common interest"), quoting Ashjari v. NYNEX Corp., No. 93 Civ. 0751, 1998 WL 19995, at *4 (S.D.N.Y. Jan. 21, 1998).

Furthermore, it is undisputed that, subsequent to Brady's alleged complaints to Human Resources about the perceived anti-American sentiment, Human Resources sent around a memorandum, reminding CLS employees that "inappropriate and unlawful behavior," including anti-American, anti-French, and anti-Semitic remarks "would not be tolerated."  (Brady Dep. Ex. JJ.)  It is also undisputed that there were no other reports of discriminatory conduct after distribution of the memorandum.  (Hayes Aff. ¶ 9.)  Thus, CLS "took immediate and appropriate remedial action" to address the allegations of discriminatory conduct.  Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 441 (2d Cir. 1999).

Finally, plaintiff has provided no evidence that he was treated less favorably than employees of French or other non-American origins, or that Americans at CLS generally suffered in the terms of their employment, either during the beginning of the Iraq war, or ever. Indeed, just as a reasonable jury could not infer age discrimination where, as here, plaintiff was

replaced by another individual of the same approximate age, a reasonable jury similarly could not infer national origin discrimination where, as here, plaintiff was replaced by another person of the same national origin.  Thus, plaintiff's "conclusory allegations of" national origin discrimination are insufficient to defeat defendants' motion for summary judgment.  Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).[16]

Accordingly, defendants' motion for summary judgment on plaintiff's age and national origin discrimination claims is granted.

B.      Military Status Discrimination

Plaintiff also claims that his termination was motivated, not by his job performance, but by defendants' anti-military animus.  Specifically, Brady claims that Schindler ridiculed his "rigid military like" approach to his job (Pl. Mem. 9), and that Pages "demanded" to see e-mails sent by plaintiff's West Point classmates, and blamed Brady and his colleagues for the Iraq war (id. 8).  Because plaintiff has failed to set forth any evidence from which a reasonable jury could infer that his termination was the result of an anti-military animus, defendants' motion for summary judgment on plaintiff's military status discrimination claim will be granted.

---

[16] Defendants make several other arguments in support of their motion for summary judgment on plaintiff's discrimination claims.  For example, defendants argue that plaintiff cannot show that his termination was motivated by an age-based animus because, even if Schindler made derogatory comments based on plaintiff's age, the decision to terminate plaintiff was made by Pages and not Schindler, and therefore the decision to terminate plaintiff could not have been motivated by an age-based animus.  In addition, defendants argue that a discriminatory animus cannot be attributed to Pages because Pages both hired and fired plaintiff, and "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motive that would be inconsistent with the decision to hire."  (Defs. Mem. 18, quoting Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997).)  Since plaintiff has submitted absolutely no evidence that would allow a reasonable trier of fact to find that he was discriminated against on the basis of his age or national origin, there is no need to decide who hired, promoted, or terminated him.

As an initial matter, the legal basis for plaintiff's military status discrimination claim is
unclear.  While the SHRL protects employees from discrimination on the basis of "military
status," N.Y. Exec. Law § 296(1), plaintiff fails to discuss the SHRL in his response to
defendants' motion, and instead refers, for the first time during this litigation, to the Uniform
Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301 *et seq*.
(Pl. Mem. 23.)  Defendants argue that plaintiff cannot base his military status discrimination
claim on USERRA, as plaintiff did not raise that claim in his initial complaint.  (See Defs. Reply
8, citing Smythe v. Potter, No. 4:05 CV 1471, 2006 WL 2927545, at *2 (E.D. Mo. Oct. 11, 2006
(dismissing claim of veteran-status discrimination where plaintiff originally asserted his claim
under Title VII and not USERRA).  However, the legal basis for plaintiff's claim is irrelevant;
regardless of whether plaintiff bases his claim on SHRL or USERRA, the claim fails because he
has provided absolutely no evidence that he was discriminated against on the basis of his
military status.[17]

Plaintiff bases his military status discrimination claim on many of the same allegations on
which he bases his national origin discrimination claim.  Plaintiff alleges that, "[t]oward the end
of 2002, beginning of 2003," tension between American and French employees at CLS increased

---

[17] The parties disagree over whether plaintiff can accurately be characterized as a
"Vietnam veteran," since he did not actually serve in Vietnam.  Defendants argue that plaintiff is
not entitled to protection under federal law as a "Vietnam veteran" because he "was not on active
duty until June 1975 and was never stationed in Vietnam."  (Defs. Mem. 22, citing Brady Dep.
274.)  Plaintiff argues that even though he was not stationed in Vietnam, he is still entitled to
protection under USERRA because he was a "Vietnam War Era Veteran."  (Pl. Mem. 23, citing
Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11 (1st Cir. 2007).)  This dispute is
irrelevant, however, as a reasonable trier of fact could not find that plaintiff was discriminated
against on the basis of his military status, either as a "Vietnam veteran," a "Vietnam War Era
Veteran," or any other possible classification pertaining to his military status.

due to the invasion of Iraq.  (Pl. Mem. 18.)  As a result of that tension, plaintiff alleges that Pages "demand[ed]" that plaintiff forward to Pages any e-mails he received from his West Point colleagues, in order to "see[] what [plaintiff's] side had to say about [the war].")  (Brady Dep. 292-94.)  Plaintiff forwarded one such e-mail, with the note "[t]hought you might be interested . . . ."  (Howard Dep. Ex. 9.)  However, plaintiff claims that he stopped forwarding emails to Pages when Pages told him the war was "the West Pointer's fault."  (Pl. Mem. 19, quoting Brady Dep. 252.)  Pages claims that he never "order[ed]" plaintiff to send him any e-mails (id.), but that plaintiff forwarded them voluntarily, and that he never made any of the alleged comments to plaintiff.

Even assuming that Pages did make the remarks attributed to him, plaintiff has set forth no evidence from which a reasonable jury could find that Pages decided to terminate him because of his prior military service.  According to Brady, both the conversations he had with Pages about the Iraq war, as well as Pages' "demand" to see the e-mails from his West Point colleagues, were "[in]appropriate" actions of an individual in a supervisory position.  (Brady Dep. 119.)  Once again, Brady mistakes what might be viewed as inappropriate behavior at the workplace for discriminatory conduct.  Even if Brady felt coerced to share his e-mails with Pages – a contention that is belied by the record, as the only e-mail in the record that Brady sent to Pages began with the notation, "[t]hought you might be interested," hardly suggestive of coercion – there is no evidence that Pages's conduct was motivated by an anti-military bias, or that his decision to terminate Brady was in anyway linked to his "[in]appropriate" demand.

Furthermore, more than a year passed between the alleged discriminatory conduct and Brady's termination, and as previously discussed, a reasonable jury could not infer

discrimination from such an attenuated temporal relationship.  Finally, even if Pages's comments with respect to the Iraq war belied some underlying anti-military bias directed specifically against Brady, and were not simply general expressions of Pages' opinions regarding the war, it is undisputed that Pages agreed to promote Brady a few months *after* the alleged discriminatory comments were made.  Again, plaintiff does not attempt to explain why Pages would agree to promote him, notwithstanding his purported anti-military animus, but then terminate him a year later because of that animus.

Plaintiff's military status discrimination claim against Schindler is similarly nonexistent. Plaintiff alleges that, in early 2004, Schindler said to him, "[w]e are no longer going to need your strict adherence to rules and regulations.  Your military[-]like fascination with following the rules and regulations is no longer necessary."  (Pl. Mem. 20, quoting Brady Dep. 166.)  Even assuming that Schindler made the alleged statement, the reference to Brady's "military[-]like fascination" is a stray remark from which no reasonable person could infer a discriminatory animus.  See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("[S]tray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination.").

Moreover, Schindler's alleged remark was made in direct reference, not to Brady's veteran status, but to his personality and management style, and to his alleged reluctance to continue reporting to Schindler, which Brady claimed violated NYSE and NASD rules.  Thus, the remark reflected, at most, only that Schindler disapproved of Brady's job performance, possibly because he objected to Brady's insistence on adherence to legal requirements, an opinion that is also reflected in Brady's 2004 performance review; the remark is not evidence

that Schindler disliked Brady because he was once a member of the armed services.  "[T]he more

. . . oblique the remarks are in relation to the employer's adverse action, the less they prove that

the action was motivated by discrimination."  <u>Tomassi v. Insignia Fin. Group, Inc.</u>, 478 F.3d

111, 115 (2d Cir. 2007).  Schindler's alleged remark is so "oblique" in relation to plaintiff's

termination that it could not reasonably be considered evidence of a discriminatory animus.

In sum, plaintiff's discrimination claims are, at best, unreasonable interpretations of the

record, and at worst, completely disingenuous.  Indeed, plaintiff testified during his deposition

that he himself believed that he was terminated, not due to unlawful discrimination, but "for

trying to get investment banking out of research's business" and because he was not "moldable

to do things [defendants'] way and not be so concerned with rules and regulations."  (Brady Dep.

298.)

Accordingly, defendants' motion for summary judgment on plaintiff's military status

discrimination claim is granted.

## IV.    Tortious Interference

Plaintiff also alleges in his complaint that defendants "intentionally and maliciously sent

a form U-5 to the NASD which stated that [p]laintiff was terminated for 'performance' reasons."

(Am. Compl. ¶ 81.)  According to plaintiff, "[b]y filing the aforementioned U-5, the [d]efendants

tortiously interfered with the [p]laintiff's ability to secure new employment."  (<u>Id</u>. ¶ 82.)

Defendants argue that "New York law bars this claim."  (Defs. Mem. 23.)  Defendants are

correct; therefore, summary judgment will be granted on plaintiff's tortious interference claim.

As an initial matter, it appears that plaintiff has abandoned his claim for tortious

interference, as he did not address the claim in his response to defendants' motion.  However,

insofar as plaintiff still asserts a tortious interference claim, it fails as a matter of law.  "[T]o prevail on such a claim, . . . plaintiff must prove that (1) [he] had a business relationship with a third party; (2) the defendant[s] knew of that relationship and intentionally interfered with it; (3) the defendant[s] acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant[s]' interference caused injury to the relationship."  Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003) ("Carvel I"), citing Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997).  In addition, unless the conduct at issue is "criminal or independently tortious," to establish the tort, plaintiff must prove that "defendant[s] [have] engage[d] in conduct for the sole purpose of inflicting intentional harm on plaintiff."  Carvel Corp. v. Noonan, 3 N.Y.3d 182, 190 (2004) (internal quotation marks and citation omitted) ("Carvel II").

Although "[t]he tort of intentional interference with prospective economic relations is relatively simple to understand in theory – but notoriously complicated in practice," Carvel I, 350 F.3d at 18, application of the rule is exceedingly simple in this case.  Plaintiff has failed to set forth any evidence showing that (1) he had a business relationship with a third party; (2) the defendants knew of that relationship and intentionally interfered with it by filing a fraudulent Form U-5; (3) the defendants filed the Form U-5 solely out of malice or "for the sole purpose of inflicting intentional harm on plaintiff"; or (4) the defendants' interference caused injury to any potential employment relationship.  Moreover, even if plaintiff could establish any of those elements, he could not state a claim in this case because he fails to show that the filing of a false Form U-5 constitutes criminal or independently tortious activity; indeed, the New York Court of Appeals has specifically rejected the contention that filing a false Form U-5 could legally constitute actionable defamation, which is the only independent tort plaintiff conceivably asserts

in his tortious interference claim.  See Rosenberg v. Metlife, Inc., 8 N.Y.3d 359, 368 (2007)

("Statements made by an employer on a NASD employee termination notice are subject to an

absolute privilege in a suit for defamation.").

In addition, plaintiff alleges that defendants provided false, negative information directly

to potential employers, thereby tortiously interfering with his employment prospects.  Plaintiff's

conclusory, unsupported allegations that negative information was provided by defendants

directly to potential employers are insufficient to withstand summary judgment.  Plaintiff

submits no evidence of any such information being given to anyone by any defendants.  Indeed,

it is undisputed that it is defendants' policy to provide only dates of employment and titles held

when a reference is requested by a potential employer, and moreover, there is no evidence that

any potential employer made a request for a reference with respect to plaintiff.  (Hayes Aff. ¶

17.)  As there is no factual basis for plaintiff's tortious interference claim, it must be dismissed.

Accordingly, defendants' motion for summary judgment on plaintiff's tortious

interference claim is granted.

## V.    Vacation Pay

Brady also alleges that CLS failed to pay him for his unused vacation days when he was

terminated.  In support of his claim, Brady offers his own vague, conclusory testimony that he

was entitled to a certain amount of vacation pay upon his termination.  (Brady Dep. 305.)

Conversely, defendants claim that Brady was paid for all of his unused accrued vacation days.

In support of their claim, defendants submit the testimony of Donna Hayes, Human Resources

Specialist, who testified that Brady "was paid for any unused accrued vacation plus his carry-

over days," and that "the payroll register" maintained by CLS "shows that . . . the pay date was

July 14, 2004." (Hayes Dep. 97, 161.) Defendants also submit that register, which states that $5,846.15 was directly deposited into Brady's account on that day. (Hayes Dep. Ex. 14.) Defendants argue that summary judgment should be granted because "[p]laintiff has offered no evidence that this payment was rejected by his bank or otherwise was not made, and such payment was not returned to defendants." (Defs. Mem. 24, citing Hayes Aff. ¶ 16.) Thus, defendants claim that summary judgment must be granted, "[g]iven the undisputed proof of direct deposit of this payment." (Id.) The Court agrees.

As an initial matter, plaintiff does not even address his vacation pay claim in his response to defendants' motion, thus abandoning the claim. Moreover, although he alleges in his Rule 56.1 Counterstatement that he was not paid for his unused vacation days, he does not support that contention with any citation to the record. Such conclusory allegations in a Rule 56.1 Counterstatement, without relevant citations to the record, are insufficient to defeat a motion for summary judgment. See Loucar v. Boston Mkt. Corp., 294 F. Supp. 2d 472, 478 (S.D.N.Y. 2003).

Furthermore, even assuming plaintiff has not abandoned this claim, upon searching examination of the record, the Court has found no evidence supporting it. For example, plaintiff never actually states in his deposition that he was not paid for his unused vacation days – the sum total of his deposition testimony is that he was supposed to receive payment for his unused vacation days upon termination (Brady Dep. 305), which defendants do not dispute (see Hayes Dep. 161). Thus, at most, plaintiff's deposition testimony constitutes a mere "scintilla" of evidence, which does not entitle him to survive a motion for summary judgment. Del. & Hudson Ry. Co. v. Cons. Rail Corp., 902 F.2d 174, 178 (2d Cir. 1990), quoting Anderson, 477 U.S. at

252; see Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (the non-moving party cannot rely on "some metaphysical doubt as to the material facts" to defeat a motion for summary judgment).

Moreover, plaintiff does not provide any additional evidence supporting his claim. For example, plaintiff does not provide bank records showing an absence of the direct deposit payment that the payroll register reflects was made on July 14, 2004, and plaintiff's affidavit contains no mention of this claim. Nor does plaintiff set forth any calculation or explanation of how he arrived at the belief that he was underpaid on this score. As defendants have set forth conclusive proof that plaintiff was paid for his unused vacation days, and as plaintiff offers no "persuasive evidence that [his] claim is not implausible," Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988), no rational jury could find in plaintiff's favor on this claim. See Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 86 (2d Cir. 1996).

Accordingly, defendants' motion for summary judgment on plaintiff's claim that he was not paid for his unused vacation days is granted.

## VI.     Corporate Liability

Finally, defendants argue that plaintiff's claims must be dismissed against defendants Calyon and Credit Agricole, S.A. Defendants argue that, "[a]s plaintiff has adduced no facts to even suggest that Calyon or Credit Agricole, S.A. played any role in his employment, much less any wrongful conduct he alleges, these entities should be dismissed." (Defs. Mem. 24.) Plaintiff argues that "Calyon and Credit Agricole were both involved in overseeing his employment," and so "should be held in the case." (Pl. Mem. 25.) Because there is no basis on which to pierce the corporate veil in this case, defendants' motion for summary judgment on the claims against

Calyon and Credit Agricole, S.A. will be granted.

Because the Court has dismissed plaintiff's discrimination claims, the only remaining claim against Calyon and Credit Agricole, S.A. – the parent companies of CLS – is for breach of contract.  Plaintiff's breach of contract claim against Calyon and Credit Agricole, S.A. "depend[s] entirely on whether it is appropriate to pierce the corporate veil."[18]  Quinn v. Teti, 234 F.3d 1262, 2000 WL 1616806, at *2 (2d Cir. Oct. 27, 2000) (unpublished opinion).  Under New York law, "[a] party seeking to hold a parent liable for a subsidiary's breach of contract bears the burden of establishing that the parent corporation 'exercised complete domination of [the subsidiary] corporation in respect to the transaction attacked; and . . . that such domination was used to commit a fraud or wrong against the plaintiff which resulted in the plaintiff's injury.'"  Banks v. Corr. Servs. Corp., 475 F. Supp. 2d 189, 196 (E.D.N.Y. 2007), quoting Morris v. N.Y. State Dep't of Taxation and Fin., 82 N.Y.2d 135, 141 (1993).  See Am. Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997).  Under this standard, plaintiff must come forward with evidence that Calyon and Credit Agricole, S.A. "dominated" CLS "to

---

[18]  In briefing this issue, the parties only analyzed whether Calyon and Credit Agricole, S.A. could be held liable for discrimination, and not whether they could be held liable for breach of contract.  (See Defs. Mem. 24-25; Pl. Mem. 24-25.)  Because plaintiff's discrimination claims have been dismissed, the issue of whether Calyon and Credit Agricole, S.A. could be held liable under the relevant discrimination laws is moot.  However, even if plaintiff's discrimination claims remained viable, Calyon and Credit Agricole, S.A. could not be held liable for discrimination for the same reasons that they can not be held liable for breach of contract – they did not contribute to the decision to terminate plaintiff, and they did not exert significant control over CLS's daily operations.  See Houston v. Fidelity, No. 95 Civ. 7764, 1997 WL 97838, at *12 (S.D.N.Y. Mar. 6, 1997) (in order to be held liable for the alleged discriminatory conduct of its subsidiary, a parent company must "exercise a direct and significant degree of control over the complaining party's direct employer or the complaining party's work environment"), citing Goyette v. DCA Adver. Inc., 830 F.Supp. 737, 744 (S.D.N.Y. 1993); see also Alie v. NYNEX Corp., 158 F.R.D. 239, 245 (E.D.N.Y. 1994).

41

the extent that" it had no "independent existence." <u>Quinn v. Thomas H. Lee Co.</u>, 61 F. Supp. 2d 13, 20-21 (S.D.N.Y. 1999).

It is disputed whether Calyon and Credit Agricole, S.A. are the direct or indirect parents of CLS.  According to Pages, the "direct parent of Calyon Securities (USA) is CL Global Partners," and before May 2004, Credit Lyonnais Securities (USA) "was [also] owned by CL Global Partners, which was owned by Credit Lyonnais Capital Markets, which was owned by Credit Lyonnais, S.A."  (Pages. Dep. 35-36; <u>see</u> Howard Dep. 14.)  In support of his contention that Calyon and Credit Agricole, S.A. are direct parents of the CLS entities, plaintiff submits "an organizational chart for Calyon" reflecting the May 2004 merger (Pl. Ex. 8), and argues that, because the Employee Handbook is labeled a "Calyon" publication, Calyon must be considered the direct parent of CLS.

Plaintiff's evidence that Calyon and Credit Agricole, S.A. should be considered direct parents of the CLS entities is weak indeed.  Defendants have submitted the testimony of CLS's management countering plaintiff's assertion, and it is CLS's management – and not plaintiff – who have personal knowledge of the relationship between the CLS entities and their parents, while plaintiff bases his assertion on a general, unspecific organizational chart.  <u>See</u> <u>Patterson v. County of Oneida, N.Y.</u>, 375 F.3d 206, 219 (2d Cir. 2004) (allegations for which plaintiff lacks personal knowledge cannot avert summary judgment).  However, regardless of whether Calyon and Credit Agricole, S.A. may properly be characterized as "direct" or "indirect" parents of CLS, plaintiff has adduced no evidence showing that the corporate veil should be pierced in this case, and therefore, summary judgment is warranted here.

First, a reasonable jury could not find that Calyon or Credit Agricole, S.A. "exercised complete domination" over CLS's decision to terminate plaintiff; indeed, there is no evidence in the record that either Calyon or Credit Agricole, S.A. contributed to that decision at all.  Instead, plaintiff bases his entire action on the purported unlawful actions of Pages and Schindler, neither of whom were controlled to any significant degree by Calyon or Credit Agricole, S.A. Specifically, Pages testified that the parent companies exerted, at most, "indirect" control over his job responsibilities.  (Pages Dep. 38.)  Moreover, there is no evidence that either Pages or Schindler discussed plaintiff's termination with anyone at Calyon or Credit Agricole, S.A.  See Gaugaix v. Laboratoires Esthederm USA, Inc., No. 98 Civ. 4465, 2000 WL 1528212, at *3 (S.D.N.Y. Oct. 16, 2000) (granting summary judgment to parent company where there was no evidence that the employee who terminated plaintiff "consulted anyone from [the parent company] in making his decision").

In addition, plaintiff has adduced no evidence at all that either Credit Agricole, S.A. or Calyon exercised any significant control over CLS's daily operations generally.  Conversely, defendants submit the testimony of individuals with personal knowledge of the relationship between the CLS entities and their parents which establishes that CLS was a completely separate, independent entity from Calyon and Credit Agricole, S.A.  For example, in response to plaintiff's question of whether "Credit Agricole ha[s] any say in the day-to-day operations of [CLS]," Howard replied, "[i]n the day-to-day, no."  (Howard Dep. 156.)  Moreover, even though, after the merger, the title of the Employee Handbook was changed to reflect the new ownership, Hayes testified that, while "[t]he company name may have changed . . . the handbook was the same."  (Hayes Dep. 79.)  Thus, Calyon and Credit Agricole, S.A. exerted no control

43

over the "incidents of [plaintiff's] employment," Houston v. Fidelity, No. 95 Civ. 7764, 1997 WL 97838, at *12 (S.D.N.Y. Mar. 6, 1997), and plaintiff's unsubstantiated opinions to the contrary are insufficient to allow plaintiff to survive summary judgment.  Compare with Goyette v. DCA Adver. Inc., 830 F.Supp. 737, 746 (S.D.N.Y. 1993) (finding that the foreign parent had so "significantly affected the subsidiary's employment policies" that it could be held liable where the parent explicitly instructed the subsidiary not to fire Japanese expatriates), and Houston, 1997 WL 97838, at *12-13 (finding liability of the parent corporation where the parent established salary lines and approved interviews, hirings, and terminations).

Ironically, plaintiff's only arguable basis for his claim that CLS's parent companies exerted any control at all over CLS's decision to terminate plaintiff is defendants' contention that the whistleblower provision was instituted at the direction of Credit Agricole, S.A.  But if a jury accepted the contention that CLS was directed to institute the whistleblower provision by Credit Agricole, S.A., then the jury would also be compelled to find that the whistleblower provision was not instituted until after plaintiff was terminated, and therefore plaintiff's breach of contract claim would necessarily fail.  However, this inherent tension notwithstanding, even if Credit Agricole, S.A. did direct the inclusion of a whistleblower provision in the Compliance Manual, such a directive does not constitute sufficient oversight or domination over CLS as to render the parent companies potentially liable in this case.

_____Accordingly, defendants' motion for summary judgment with respect to plaintiff's claims against defendants Calyon and Credit Agricole, S.A. is granted.

44

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied with respect to plaintiff's breach of contract claim against Calyon Securities (USA), and granted with respect to plaintiff's remaining claims. The claims against defendants Calyon and Credit Agricole, S.A. are dismissed.

SO ORDERED.

Dated: New York, New York
       December 17, 2007

GERARD E. LYNCH
United States District Judge

45